## JOHN A. ROEBLING'S SONS COMPANY *v.* SOUTHERN POWER COMPANY.

1. Where a company engaged in transmitting electrical power ordered from another company engaged in the business of manufacturing wire for electrical transmission certain copper wire for use in the business of the purchaser, and the written contract specified the diameter of the wire and contained a clause stating that the vendor guaranteed "the wire not to vary in gauge over 1% above or below diameters given, and to have a conductivity of not less than 97% of that of pure copper," this did not exclude an implied warranty on the part of the manufacturer that the wire was so constructed as to be properly adapted for use in transmitting electricity and that it was free from latent defects rendering it unsuited to that purpose.

(*a*) Under such a contract specifying the diameter of the wire and its conductivity, there was no implied warranty that it would accomplish all that was expected of it or intended by the purchaser; but there was an implied warranty that it was properly constructed copper wire of the size and kind specified, and reasonably suited for use as such.

2. The first ground of the special demurrer to the petition was without merit. The allegation of negligence in the eighteenth paragraph may have been unnecessary and surplusage; but taken as a whole, the suit was for a breach of an implied warranty, and not for damages for a tort.

(*a*) The first clause in the eighteenth paragraph of the petition, standing alone, would be too general, as merely alleging that the wire was defectively constructed. If the defects were sufficiently alleged, this opening general statement would not render the paragraph demurrable; but the allegation as to the defect was stated in the alternative, and to this the special demurrer raised an objection which was well taken. *Green* v. *Ingram,* 16 *Ga.* 164; Gould on Pleading, 217 and note; 6 Enc. Pl. & Pr. 268; 6 Standard Enc. Proc. 694; 31 Cyc. 74. Under our practice this did not form a part of the general demurrer that no cause of action was set forth, but furnished ground for special demurrer.

(*b*) The allegation "that petitioner has sold it as such [that is, the wire as junk copper], realizing therefor the sum of $98,839.05, which was its only value," was attacked by the special demurrer on the ground that it was not shown that the sum realized was the market value of the

copper at the time and place of delivery as contemplated and fixed by the contract. This ground was well taken. It did not appear from the petition when the sale was made, or whether the price of copper, or the value of the wire, was the same at the time when thus sold as when delivered. If the value fluctuated, this would not have affected the measure of damages under the contract. *Berry* v. *Shannon*, 98 *Ga.* 459 (25 S. E. 514, 58 Am. St. R. 313); *Americus Grocery Co.* v. *Brackett*, 119 *Ga.* 489· (46 S. E. 657). Of course this would not exclude special damages in a proper case.

(c) What is said as to a former ground of demurrer controls the attack of the statement that the construction of the wire was negligence and a failure to furnish an article reasonably suited for the purpose for which it was sold.

3. The nineteenth paragraph of the petition was vague, indefinite, and uncertain, and failed to state with sufficient definiteness, the time, character, or amount of expenditures or the stoppages of business and the losses resulting therefrom. The ninth ground of the special demurrer, therefore, should have been sustained. This ground was sustained in part, but apparently was not sustained as to the general allegation of the loss of the price of the wire and the sums expended in erecting and taking down the same, with interest thereon. These allegations were also too general.

4. The tenth ground of demurrer was without merit. The action as brought was not duplicitous, but was one based upon a breach of an implied warranty. It was not alleged that the wire was not 2/0 or 3/0 copper wire, nor that it varied in gauge over one per cent., nor that it did not have a conductivity of ninety-seven per cent. of pure copper. But the action was based on the theory that the wire was furnished for use for the transmission of electrical power, and to be suspended between towers; that it was not properly constructed for the use with reference to which it was purchased; and that it had latent defects.

5. No ruling on the other grounds of demurrer requires a reversal.

SEPTEMBER 23, 1914.

Attachment. Before Judge Pendleton. Fulton superior court. May 23, 1913.

*Noble, Estabrook & McHarg* and *Henry A. Alexander,* for plaintiff in error.

*King & Spalding, M. L. Underwood,* and *Norman A. Cocke,* contra.

FISH, C. J. We will first consider the general demurrer to the petition. The John A. Roebling's Sons Company, by a writing dated in New York City, May 28, 1906, and addressed to the Southern ·Power Company, Charlotte, N. C., stated: "We beg leave to quote you on approximately 730,000 lbs., of Solid and Stranded hard drawn and Semi-hard drawn Copper wire, as follows." Then followed seven kinds, stating the size, the number of wires, the

30

diameter, the approximate weight per mile, the cost of delivery for North Carolina and for South Carolina of each item. Among these were 2/0 and 3/0 sizes. The paper further contained the following: "We guarantee the wire not to vary in gauge over 1% above or below diameters given, and to have a conductivity of not less than 97 per cent. of that of pure copper." The remainder of the paper referred to the times of delivery and payment; and it was also stated that the acceptance of this proposition was to constitute a purchase of the material at the prices named, and to bind the company to deliver it as stated. Under this was written the word "Accepted," followed by the signature of the plaintiff. A large lot of wire known as 2/0 and 3/0 with hemp center and copper strands was delivered. The plaintiff did not allege that it lacked the conductivity guaranteed, but alleged that it was defectively constructed and unsound, and was unfit for the purpose for which it was furnished and for which it was sold by the defendant to the plaintiff with knowledge of the purpose for which it was bought. It was alleged that either the material of which the wire was constructed was so defective as to pit and break, or that some substance which had been put upon the hemp produced a corrosive material which rendered the wire defective and the lines strung with it wholly useless and unable to be maintained as transmission lines and of no value except as junk copper. It was also alleged, that the wire was shipped in such completed shape that plaintiff had no knowledge or notice or means of knowing of any defect in its manufacture; that wire of the character and description, if sound and in good order, unless broken by external and violent means, would last for about fifty years; but that these wires commenced breaking shortly after the completion of the lines of transmission for which they were used, and continued to do so. The controlling question raised by the general demurrer was whether the descriptive words "2/0" and "3/0," and the guarantee that the gauge would not vary over 1% above or below the diameter given, and that the wire would have a conductivity of not less than 97% of that of pure copper, excluded all implied warranties as to quality or suitableness for the purpose for which it was intended. This question was argued, first, with reference to the provisions of the code of this State and the decisions made under them; and second, with reference to the com-

mon law and decisions of other courts, treating the contract as governed by the common law. We will consider the question under these divisions.

By the Civil Code (1910), § 4135, referring to sales of personalty, it is declared: "If there is no express covenant of warranty, the purchaser must ·exercise caution in detecting defects; the seller, however, in all cases (unless expressly or from the nature of the transaction excepted) warrants—(1) that he has a valid title and right to sell; (2) that the article sold is merchantable, and reasonably suited to the use intended; (3) that he knows of no latent defects undisclosed." This would seem on its face to be plain: In the absence of an express warranty it places upon the purchaser the duty of using caution in detecting defects, but it declares that "in all cases (unless expressly or from the nature of the transaction excepted)" there is a warranty declared by law to be implied in the respects mentioned. So that such implied warranty arises unless there is an express exception of it, or unless from the nature of the transaction it is excepted. This section was contained in the first Civil Code of this State, which was adopted in 1861, but went into effect on January 1, 1863; and this has been the law of Georgia ever since. It can not be repealed by decisions of courts. If a contract expressly declares that there shall be no other warranties than those expressed, no difficulty can arise. The only possibility of difference is as to whether the nature of the transaction under investigation is such as to exclude the implied warranties, or any of them, declared in the section of the code. In some of the decisions, both in this and in other States, broad language has sometimes been used to the effect that an express warranty excludes an implied warranty; but such expressions are to be considered in connection with the question involved in the cases in which they were used. It would seem to be wholly illogical and unreasonable to say that if in the sale of goods the title was expressly warranted, this excluded all implied warranty of merchantability or of the absence of latent defects; or, on the other hand, that if there was an express warranty that goods were of a certain character or quality, it excluded an implied warranty that the seller had a valid title to them. There is no conflict between the two, and one does not overlap or exclude the other. If a merchant ordered coffee warranted to be equal to a given sample, he certainly would not mean that he waived any ques-

tion as to whether the seller owned the coffee. Where the express contract covers or supersedes the implied warranty of the law, it excludes the latter; but where the two in no way conflict, and the parties have not undertaken by the express warranty to cover the whole subject-matter of the sale and of the warranties which the law itself implies, they are not excluded except so far as the express warranty deals with the subject-matter of the implied warranty. There is undoubtedly much confusion on this subject. The theory that where the parties have reduced their contract to writing, they will be presumed to have covered all matters touching the sale, is only partially true. If a merchant should order goods of a certain character, without specifying the time for delivery, and the order should be accepted, this would be an express contract, and, if in writing, an express written contract; and yet who doubts that the law would imply that the delivery should be made within a reasonable time? Nor is it likely that any one would contend that because the contract was reduced to writing the law would imply nothing further. If a contractor should agree in writing to complete a house, specifying the size, number of rooms etc., the law would unquestionably imply that the work should be done in a workmanlike manner, and, if he agreed to furnish materials, that they should be proper and suitable for the purpose. Many instances might be cited in which parties enter into express contracts, and yet the law implies certain incidents or terms in regard to the carrying out of the contract. So that the maxim, expressum facit cessare tacitum, has its limitations. Suppose that a purchaser should order from a manufacturer a table warranted to be of certain dimensions and with certain ornamentations, can it be contended that this would exclude an implied warranty that the table should be properly put together, and that such a contract would be fulfilled by supplying a table with the dimensions and ornamentations specified, although it might be constructed of such inferior material as to fall down as soon as the purchaser should place a dictionary upon it and turn to the word "warranty"? Or, if the paint used was so improper in character as to soil or corrode everything put upon it, or if the legs were fastened on with carpet-tacks? Or, if a piano should be warranted to be a genuine Knabe, would there be no implied warranty that the manufacturer should sell a piano with proper chords and keys? Or, if a carpenter should order from a manufacturer an

auger, specifying or requiring a warranty that it should be of a certain length and diameter and with a certain character of handle, would there not be an implied contract or warranty that it should be an auger which would bore? Could it be made of lead or pot metal, on the theory that the specification of the size and handle excluded any other contract or warranty implied by law? We are not now discussing a possible difference between implied terms in a contract, and whether general descriptive terms are more properly to be called warranties or agreements; but we are endeavoring to show that an arbitrary and unlimited statement that because a contract has been made in writing nothing else can be implied in regard to the subject-matter can be carried to such an extreme as to result in a reductio ad absurdum.

We are not contending that terms can be added to a written contract by parol testimony; but that where the parties make a written contract, the law may make certain implications in regard to the subject-matter, and that one of the things which it implies in a sale of personalty is a warranty of certain things, unless that warranty is excluded by reason of the terms of the contract itself or by reason of the nature of the transaction. This is an implication which the law itself imposes, except under the circumstances mentioned; and it is an entirely different matter from endeavoring to superadd to a written contract parol agreements.

In *Austin & Ellis* v. *Cox,* 60 *Ga.* 520, where a note given for the price of a commercial fertilizer declared that "This fertilizer is sold under the inspection and analysis of Dr. A. Means, inspector at Savannah, and the Department of Agriculture at Atlanta," it was held that this did not preclude the maker, when sued upon the note, from setting up a warranty of quality, express or implied, and urging a total failure of consideration in that the article sold was not a fertilizer, had no fertilizing properties, and was wholly worthless. In the opinion Bleckley, J., said: "Suppose it were true that the article had been inspected and analyzed by the aggregate scientific skill of the universe, and that nevertheless it was not a fertilizer, had no fertilizing property, and was wholly worthless, would the inspection and analysis make the article 'merchantable, and reasonably suited to the use intended'? . . We can see no reason for treating all questions as to its quality closed."

A careful consideration, however, of the decisions of this court

will show that there is no necessary conflict between them when what is said in each is construed in reference to the facts under consideration. In *Wilcox* v. *Owens,* 64 *Ga.* 601, a guano note contained the clause: "Guano sold and guaranteed under analysis of Dr. A. Means, inspector, Savannah, which analysis has been submitted to me." The question was whether this guaranty or warranty by implication excluded the defense that the fertilizer was not reasonably suited to the purpose for which it was sold. Jackson, J., after quoting the section of the code above set out, said: "Therefore in this case the sellers warranted that this fertilizer was merchantable and reasonably suited to the use intended, unless this warranty be expressly excepted from this contract, or unless it is excepted therefrom from the nature of the transaction. It is not pretended that the warranty of the title is excluded by this guaranty; is the other implied warranty excluded? There are no words in this contract that expressly except this warranty which the law also puts in it; and the nature of the transaction does not except it, because the thing sold was known by both parties to be for fertilizing the soil, that was the use intended, and that use and its adaptation to it are of the very essence of the contract. . . The guarantee that the article comes up to Dr. Means' analysis does not expressly exclude the warranty that it is merchantable and reasonably suited to the use intended—to wit, the manuring the land and increasing the crop. The purchaser had a right to stipulate for both, and not to buy unless both were in the contract; and both might well consist without the overthrow of either. The one the law gave the purchaser; the other the express contract gave him." This was a clear, unambiguous ruling that a warranty of a single thing in connection with a sale did not, under our code, exclude the implied warranties imposed by the law, unless they were expressly excluded or there was an inconsistency between the warranty made and the implied warranty or the former was of such a character as to impliedly exclude the latter. This decision has never been modified or overruled, and, if there were any conflict between it and what was said in the later decisions, under our code (Civil Code (1910), § 6207) the decision quoted would control until overruled or modified. But we do not mean to hold that there is any conflict.

In *Johnson* v. *Latimer,* 71 *Ga.* 470, Latimer sued Johnson on an open account for the first payment on a "Monarch separator." The

evidence on behalf of the plaintiff was to the effect, that the defendant ordered a machine with a cylinder of a given size, and there was no warranty as to weight; that the plaintiff warned him that it would be too large, but he insisted that he knew what he desired; that the plaintiff said also that he supposed the freight would be $1.65 per 100 lbs., and in fact it was $1.54 per 100; and that upon arrival of the machine the defendant refused to take it. The evidence on behalf of the defendant was to the effect, that he desired a portable separator, for the purpose of hauling it about the country with his team; that he so informed the plaintiff, who guaranteed that the machine should be what he desired and that it should not weigh over 2000 lbs.; that he also agreed that the freight should not cost over $33 or $34, but upon its arrival at its point of destination, the defendant was called upon for $82 freight; and that the actual weight was 2800 lbs. One ground of the motion for a new trial was, because the court refused a request to give in charge to the jury the following: "If the machine sold defendant by plaintiff is not reasonably suited to the use intended, plaintiff can not recover in this case, unless there was a special contract as to size," etc. Another ground was because the court charged as follows: "The warranty which the law required Latimer to make was that the article sold was a separator, that is to say, that it would separate the grain from the chaff; but he did not warrant that it was suitable for transportation over the roads in the country, or that it was such a machine as could be pulled by Johnson's teams." Hall, J., delivering the opinion, said that the court thought that all that was intended by the charge was that the law did not require a warranty that the machine was suitable for transportation over the roads of the country. He stated that a simple refusal of the request, without any charge upon an inapplicable principle, would have been a better course. He then added: "It is only in the absence of an express warranty upon the subject that resort can be had to an implied warranty." And, after quoting the code section on the subject, he added: "The maxim of the common law, 'expressum facit cessare tacitum,' embodies the principle." This was all that was said on the subject. It is evident that it was not held that there was no implied warranty that the separator would separate; but that where there was an express agreement in regard to the kind of cylinder which should be placed upon the

machine, there was no implied warranty that it was suitable for the country roads in the defendant's vicinity.

In *Malsby* v. *Young,* 104 *Ga.* 205 (30 S. E. 854), a steam engine and sawmill were sold. The machinery was expressly warranted to be of good material and durable, and, with good care and proper usage, to do as good work as any made in the United States, of similar style and like amount of use, and to be in good fair condition. It was provided, that, if it did not meet the above warranty after a trial of ten days, written notice should be immediately given to the vendors, stating wherein it failed to satisfy the warranty, and a reasonable time should be given to them to send a competent person to remedy the difficulty; that the vendors reserved the right to replace any defective parts; and that if then the machinery could not be made to fill the warranty, it was to be returned by the purchaser to the place where it was received, and another machine was to be substituted therefor that should fill the warranty, or the notes and money should be immediately returned and the contract canceled, neither party in such case to make or have any claim against the other. It was still further declared: "All warranties to be invalid in case the machinery is not settled for when delivered, or if this warranty is changed, whether by erasure, addition, or waiver, or if the purchaser shall in any respect have failed to comply therewith." It will readily be seen that this warranty on its face covered the entire ground as to being reasonably suited to the use intended, and necessarily excluded an implied warranty on that subject. The trial judge charged, that, whether there was an express warranty or not, the law would make the seller warrant the machinery to be reasonably suited to the use intended. This was held to be error. In discussing the question, Little, J., said: "Much would depend upon the nature and extent of the warranty, where it was express, whether any implied warranty would exist in connection with what was expressed; and as an express warranty was made a part of the written contract on which the suit was founded, and by the contract the defendants received the machinery subject to the conditions of the warranty printed therein, the rights of the parties as to the nature and character of the articles sold are to be measured by the representations and warranties therein contained; and as such express warranty covered the conditions as to title, make, capacity,

etc., fully and in detail, the charge of the court complained of was error." This distinctly recognized the rule as declared in *Wilcox* v. *Owens,* supra; and while in the further discussion the expression was used, "it is only in the absence of an express warranty that resort can be had to an implied warranty," this is to be taken in connection with what was previously said, showing that the express warranty was of a character to cover the entire matter of the suitableness of the machinery to the work to be done, and to leave no room for an implied warranty on that subject.

In *National Computing Scale Co.* v. *Eaves,* 116 *Ga.* 511 (42 S. E. 783), suit was brought for the price of a set of computing scales. The defendants pleaded failure of consideration, and that the scales were not reasonably suited to the use intended. The written contract in regard to the sale contained a guaranty that if the scales should get out of order at any time within two years from date of shipment, with ordinary use (not dropped or broken), the vendor was to quickly repair them free of charge, the purchaser paying transportation charges to and from the factory. It was held that this guaranty did not exclude an implied warranty that the articles sold were reasonably suited to the use intended; but that the purchaser could not defeat an action brought to recover the purchase-money, on the ground that the articles were not so suited, unless it appeared that when sold they were so defective as not to be reasonably suited to the use intended; or unless they became defective after the sale and the seller had failed and refused to repair them within a reasonable time; or unless the defect thus arising was of such a character that it could not have been remedied even if the articles had been returned. In the opinion Justice Cobb said: "While there is no express warranty in the contract, other than the warranty that the plaintiff will repair any defects when not brought about in a given way, still there is nothing in the contract which excludes the implied warranty of the law, nor is the transaction one of such a nature as that such warranty would be excluded." See also a discussion of the subject in *Elgin Jewelry Co.* v. *Estes,* 122 *Ga.* 807 (50 S. E. 939).

In *Bullard* v. *Brewer,* 118 *Ga.* 918 (45 S. E. 711), suit was brought on a promissory note given for the purchase-money of a horse. The note contained the following: "This note having been given to said S. S. Brewer, as per contract for one black horse

about seven years old, a little thick-winded. It is hereby agreed that the ownership and title to said horse shall remain in said S. S. Brewer until this note is fully paid; and it is distinctly understood that I take the risk of the horse dying." The defendant pleaded that the plaintiff expressly warranted the horse to be "sound and all right in every respect," but that he proved to be unsound and entirely worthless. It was held that it was incompetent to show an express parol warranty by the representations and statements, for the purpose of adding to, taking from, or varying the written contract. It was plain, in the face of the statements in the note that the horse was thick-winded and that the purchaser took the risk of his dying, that the testimony was incompetent on the ground that parol evidence was not admissible to change the agreement. This did not involve the question of an implied warranty imposed by law.

In *Holcomb* v. *Cable Co.,* 119 *Ga.* 466 (46 S. E. 671), suit was brought on a promissory note given for the purchase-price of a piano. It contained the following, among other things: "If said instrument be defective, such defect shall be reported to the Cable Company or their agent within ——— days of the date of this obligation; and should I fail to make complaint within said time, it shall be held as conclusive evidence that no defect exists, or the same is waived if existing; and I hereby agree not to set up any such plea in defense of this obligation, if not reported within said time." The defendants pleaded that, contemporaneously with the execution of the note, two written warranties had been given. One of them was signed by the vendor through its salesman, and was as follows: "This certifies that Cable Piano, Style N. Mah. No. 38985, is fully warranted for five years from date of its manufacture; and if within that time, with proper care and usage, it proves defective in material or workmanship, we hereby agree to place it in good repair or exchange it for another of same style at our expense. Exposure· to dampness and sudden changes of temperature will check varnish, and cause other damage to the best piano; and against such exposure, ill-use, neglect, ordinary wear, accidents, and tuning, we will not be responsible." The other agreement was made by the agent in his own name, with reference to taking back the piano in part payment for another. It was held that this latter paper was not binding on the principal. In the answer of the defendants it was further set up that the vendor's agent represented

that the piano was fitted with a particular kind of action, and that this was untrue. It was alleged that as soon as the defendants learned of the defects in the instrument, "of it not being what the plaintiff represented it to be, of it not being fitted and suitable for the use intended, they repudiated the contract of sale and demanded of the plaintiff another instrument in accordance with the contract, which demand was refused by the plaintiff." This was the only reference in the answer which might be construed as setting up an implied warranty. It was held that the agreement contained in the note and written warranty were sufficient to cover the entire contract on the subject of quality; and it was added that this excluded implied warranty on the same subject. It will be seen that this merely construed the written instrument as sufficient to cover the particular subject, and that accordingly it excluded implication on the subject so entirely covered. It did not hold that a mere express warranty of one thing contained in a contract which did not purport to cover the entire subject, and which was not inconsistent with the implied warranties of the law, would necessarily exclude them.

In *Henderson Elevator Co.* v. *North Ga. Milling Co.*, 126 *Ga.* 279 (55 S. E. 50), suit was brought for a breach of contract in regard to the purchase of certain corn. The defendant pleaded, among other things, breach of warranty, in that the plaintiff agreed to sell to it "20,000 bushels of number 2 white corn, bulk," and that the corn shipped was not of that character or quality; that grinding some of it produced sour meal; and that defendant refused to accept further shipments. It was held, that, in a contract for the sale of goods, words descriptive of the subject-matter of sale and the time of shipment are ordinarily to be regarded as a warranty. No question of implied warranty was involved, or whether such descriptive words would exclude the implied warranty of the law in other respects. Some courts have preferred to treat descriptive words of this character in a contract rather as being a term of the contract or part of the agreement than as a warranty strictly speaking, which is usually a collateral agreement. But, for the purposes of the present discussion, we need not enter into that subject.

In *Springer* v. *Indianapolis Brewing Co.*, 126 *Ga.* 321 (55 S. E. 53), it was said that from the evidence it appeared that both the buyer and seller understood that the shipment of beer, for the pur-

chase-price of which the suit was brought, was to be of the same quality as that of a previous car-load of beer, and that this amounted to an express warranty of the quality, and the standard was the grade and quality of the first shipment; and therefore it was held error to charge on the subject of implied warranty in regard to the quality of the beer. It will thus be seen that it was held that the exact standard was fixed by the quality of other beer previously shipped, and that the test was to be whether it measured up to that quality, rather than whether it was suitable for sale. The expression in the headnote and opinion, to the effect that an express warranty excluded an implied warranty, must be considered in connection with the facts before the court; and so considered, it does not conflict with previous rulings.

In *Fay & Eagan Co.* v. *Dudley,* 129 *Ga.* 314 (58 S. E. 826), suit was brought for the purchase-price of a machine known as "double end tenoner." The contract of sale, which was signed by both parties, used the descriptive words: "No 6 Double Upper and Lower Tenoning head bits, upper and lower cope heads and bits left off, but with cope spindles." It also described the borer, "with bits to mortise and bore 5/16″ mortise and hole, and to be suitable for small stationary slats, if necessary, as small as 7/8″ x 3/32″ mortise;" and saw mandrel of a particular kind, and a sash sticker with a boring attachment of a particular sort. There were provisions "that this contract is not modified or added to by any agreement not expressly stated herein; and that a retention of the property forwarded, after thirty days from date of shipment, shall constitute a trial and acceptance, be a conclusive admission of the truth of all representations made by or for the consignor, and void all its contracts of warranty express and implied." The defendants, among other things, sought to set up that the plaintiff sold the machine and warranted it to be the latest improved double-headed tenoner suited for the purposes intended, such purpose being the manufacture of doors, sashes, blinds, and furniture; and that this was known to the plaintiff. It was held that the express contract excluded the implied warranty of suitability for the particular purpose intended by the buyer. It seems quite clear that the very terms of the contract sought to exclude such implied warranty. It was accordingly held that it was error to admit in evidence representations as to the work which the machine would do, made by the

agent at the time the negotiations were pending and before the written contract was entered into. Really this was a question of adding to a contract by parol, rather than invoking the rule of law as to implied warranties. In the opinion it was stated: "In Seitz *v.* Brewers' Refrigerating Mach. Co., 141 U. S. 510 (12 Sup. Ct. 46, 35 L. ed. 837), it was held that where a known, described, and definite article is ordered of a manufacturer, although it be stated by the purchaser to be required for a particular purpose, yet if the known, described, and definite thing be actually supplied, there is no warranty that it will answer the particular purpose intended by the buyer." This statement is made one of the headnotes. It appears that this form of expression did not originate with the Supreme Court of the United States, but with an English judge; and that in the discussion by Chief Justice Fuller, it was not taken as excluding the right on the part of the buyer to claim that the machine actually furnished was not properly constructed, or would not do the work of a machine of that character. This is a different thing from fulfilling the intention of the buyer, or doing the work intended by him. Under the contract before this court when *Fay & Eagan Co.* v. *Dudley* was decided, there can be little doubt that there was no implied warranty that the machine would answer the particular purpose *"intended by the buyer."* Here again the point was that the contract covered the subject-matter of the particular warranty sought to be set up, and excluded an implied warranty on that subject. What has been just said applies also to the cases of *Brooks Lumber Co.* v. *Case Threshing Machine Co., 136 Ga.* 754 (72 S. E. 40), and *Case Threshing Machine Co.* v. *Broach,* 137 *Ga.* 602 (73 S. E. 1063).

Counsel for plaintiff in error rely with much earnestness upon certain expressions used by this court in deciding cases in which it was held that the express warranty was such as to cover the entire subject-matter, and to exclude implied warranties; and we have at some length reviewed most of the decisions of this court bearing on that subject, for the purpose of showing that, when certain general expressions are considered in connection with the facts of the cases in which they are used, there is really no substantial conflict in the rulings of this court. Counsel also cited cases decided by the Court of Appeals of this State. A discussion of the subject will be found in *Hawley Furnace Co.* v. *Van Winkle Gin Works, 4 Ga. App.* 85

(60 S. E. 1008), where Powell, J., very clearly draws the distinction between particular purposes or uses intended by the buyer and the general use for which the article is intended in manufacturing it.

It was further contended that the present case must be decided by the common law, as the contract was neither made in Georgia nor to be executed here; and that this court has held, that, in the absence of proof as to what the law of another State is, it will be presumed that the common law is there in force (possibly with the exception in those States in which the civil law is the foundation of their laws); and that this court would determine for itself what was the common law on the subject. Accordingly we will consider some of the many, and not wholly reconcilable, decisions in England and in this country on the subject in hand. It may be well at the outset, however, to remark that the section of our code on the subject of implied warranties did not originate in a separate legislative act, but in a codification of what the codifiers deemed to be the general law on the subject, and was embodied in the code which was subsequently adopted by the legislature.

It has sometimes been broadly declared that in the purchase of particular articles, the rule of caveat emptor applies at common law, but this was subject to exception. Originally cases of implied warranty were brought as actions on the case, alleging fraud, though there might be no actual fraud. Doubtless this theory rested on the idea that the person was supposed to know whether he had title to the personalty sold by him, or that he did not properly manufacture articles for another; and it was deemed that fraud might be implied or imputed from the circumstances. But in time this fictitious form of action gave way to an action of assumpsit, on the ground that a warranty might be implied from the nature of the circumstances of the case; and the tendency has since been of approximating the rule of the Roman law, which implies a warranty that the goods are merchantable and fit for the purposes for which they are known to be bought. 2 Story on Contracts (5th ed.), § 1060. At a later period a sales act was passed in England.

In Jones *v.* Just, L. R. 3 Q. B. 197, 37 L. J. (Q. B.) 89 (decided in 1868), the subject of express and implied warranties was quite fully discussed by Mellor, J. He classified the cases under five heads as follows: (1) Where goods are in esse and may be in-

spected by the buyer, and there is no fraud on the part of the seller, the maxim caveat emptor applies, even though the defect which exists in them is latent and not discoverable on examination, "at least where the seller is neither the grower nor the manufacturer." (2) Where there is a sale of a definite existing chattel specifically described, the actual condition of which is capable of being ascertained by either party, there is no implied warranty. (3) Where a known, described, and defined article is ordered of a manufacturer, although it is stated to be required by the purchaser for a particular purpose, still, if the known, described, and defined thing be actually supplied, there is no warranty that it shall answer the particular purpose intended by the buyer. (4) Where a manufacturer or dealer contracts to supply an article which he manufactures or produces, or in which he deals, to be applied to a particular purpose, so that the buyer necessarily trusts to the judgment or skill of the manufacturer or dealer, there is in that case an implied term or warranty that it shall be reasonably fit for the purposes to which it is to be applied. (5) Where the manufacturer undertakes to supply goods manufactured by him or in which he deals, but which the vendee has not had the opportunity to inspect, it is an implied term in the contract that he shall supply a merchantable article. The learned judge further said: "We are aware of no case in which the maxim caveat emptor has been applied where there has been no opportunity of inspection or where that opportunity had not been waived. . . In general, on the sale of goods by a particular description, whether the vendee is able to inspect them or not, it is an implied term of the contract that they shall reasonably answer such description; and if they do not, it is unnecessary to put any other question to the jury. . . It appears to us that in every contract to supply goods of a specific description, which the buyer has no opportunity to inspect, the goods must not only in fact answer the specific description, but must also be saleable or merchantable under that description."

In Gardiner v. Gray, 4 Campb. 144 (decided in 1815), the suit contained several counts. The first stated that the defendant undertook that 12 bags of waste silk, purchased of him by the plaintiff, should be equal to a sample produced at the time of the sale. Other counts stated the defendant's promise to be that the silk should be waste silk of a good and merchantable quality. The silk

was imported from the continent; and before it landed, samples of it which the defendant had received in a letter were shown to the plaintiff, but in the sale note no reference was made to the sample nor a particular specification of the quality of the silk. It was held that this was not a sale by sample, and that there was no warranty that the silk should correspond to the sample. It was further held that the purchaser had a right to expect a saleable article answering the description in the contract. Lord Ellenborough said: "Without any particular warranty, this is an implied term in every such contract. Where there is no opportunity to inspect the commodity, the maxim of caveat emptor does not apply." In Biggs *v.* Parkinson, 7 Hurlst. & N. 954 (decided in 1862), the plaintiffs having entered into an agreement with the East India Co., for the conveyance of troops to Bombay, the defendants undertook to supply the plaintiffs with troop stores "guaranteed to pass survey of the Honourable East India Company's officers." It was held in the Exchequer Chamber that this express warranty did not exclude the warranty implied by law that the stores should be reasonably fit for the purposes for which they were intended.

In Shepherd *v.* Pybus, 3 Mann. & Gran. 452, a boat and barge dealer sold a barge which had been built by him, and which was nearly finished and was afloat on his premises, where it was afterwards rigged and fitted up according to the agreement and was removed by the plaintiff, but, upon trial, was found to be so defectively built as to let in considerable quantities of water. Suit was brought for the breach of an implied warranty, and was sustained, notwithstanding there was a written contract describing the barge as that lying at the builder's wharf. A distinction was made between a warranty that the barge was reasonably fit for use and the contention that it was not fit for the special purpose for which the builder knew that it was designed to be used. In the opinion Tindal, C. J., said: "But in the case now before the court, the subject of the purchase was a barge built by the seller himself; and the purchaser had had no opportunity of inspecting it in its progress, and the defects which were afterwards discovered were not apparent upon inspection, and could only be detected upon trial," and therefore he declared that the ruling in a case in which there had been a full opportunity for inspection did not apply.

In Carleton *v.* Lombard, Ayres & Co., 149 N. Y. 137 (43 N. E.

422), the defendant contracted in writing to manufacture and deliver to the plaintiffs, for shipment, oil of a certain brand, color, and fire-test. The plaintiffs, pursuant to the rules of the produce exchange, which were made a part of the contract, appointed an inspector, who certified that the oil delivered was of the certain brand, color, and test contracted for. The rules also provided that an acceptance of the oil by the buyers' inspector should be an acknowledgment that the oil was in accordance with the contract. It was nevertheless held that the defendant was bound to deliver oil free from latent defects growing out of the process of manufacture, which would render it unmerchantable at the time and place of delivery, and which could be found by the exercise of reasonable care. O'Brien, J., said: "The general rule of the common law, expressed by the maxim caveat emptor, is not of universal application, though the exceptions are quite limited; and one of them is the case of a manufacturer who sells goods of his own manufacture, who, it is said, impliedly warrants that they are free from any latent defect growing out of the process of manufacture. The seller in such a case is liable for any latent defect arising from the manner in which the article is manufactured, or from the use of defective materials, of the character of which he is shown or is presumed to have knowledge. This rule, and the reasons upon which it rests, or its qualifications and limitations, have seldom been stated in the same form by courts and writers upon the subject; but that it exists as a principle in the law of contracts can not be doubted. . . It is strenuously urged, however, that it can have no application to a case like this, where the contract is in writing, with such ample description of the goods sold. But the obligation attached to an executory contract for the sale of goods by the manufacturer or maker can not be changed by the mere fact that the contract has been reduced to writing. The writing, it is true, is deemed to express the whole agreement of the parties; but since this peculiar liability arises from the nature of the transaction and the relations of the parties, without express words or even actual intention, it will remain as part of the seller's obligation, unless in some way expressly excluded. All implied warranties, therefore, from their nature, may attach to a written as well as an unwritten contract of sale. The parties may, of course, so contract with each other as to eliminate this obligation from the transaction entirely.

31

. . The plaintiffs were entitled to something more than the mere semblance or shadow of the thing designated in the contract. They were entitled to the thing itself, with all the essential qualities that rendered it valuable as an article of commerce, and free from such latent defects as would render it unmerchantable. . . It frequently happens, in large transactions, that the article which is the subject of the contract is described by some vague generic word, which, taken strictly and literally, may be satisfied by a worthless or defective article. In such cases the words may mean more than their bare definition or literal· meaning would imply, and impose upon the seller an obligation to furnish, not only the thing mentioned in the cóntract, but a merchantable article of that name." If the contract involved in the case at bar be treated as a New York contract, there can be little doubt as to the law applicable to the subject.

In Bucy v. Pitts Agricultural Works, 89 Iowa, 464 (56 N. W. 451), Given, J., said: "There are authorities holding that where there is an express warranty, none will be implied, upon the theory that by the express warranty the parties have stated, in words, that by which they agreed to be. bound. It is held, in this and many other States, that this rule does not extend to the exclusion of warranties implied by law, where they are not excluded by the terms of the contract. 'A warranty will not be implied in conflict with the express terms of the contract.' Blackmore v. Fairbanks, Morse & Co., 79 Iowa, 282 [44 N. W. 548]. The rule deducible from the authorities is that an implied and an express warranty may exist under the same contract, as when the expressed does not relate to the obligations created by the implied; but when the expressed warranty does provide as to the same obligation, it excludes the implied. In other words, the law will not imply anything as to matters about which the parties have expressly agreed." See also Boothby v. Scales, 27 Wis. 626.

In Kellogg Bridge Co. v. Hamilton, 110 U. S. 108 (3 Sup. Ct. 537, 28 L. ed. 86), a bridge company, having partially executed a contract for the construction of a bridge, entered into a written agreement whereby a subcontractor undertook, for a named sum and within a specified time, to complete its erection. The subcontractor agreed to assume and pay for all work done and material furnished up to that time by the company. Assuming this work to have

been sufficient for the purposes for which it was designed, the subcontractor proceeded with his undertaking; but the insufficiency of the work previously done by the company was disclosed during the progress of the erection of the bridge. No statement or representation was made by the company as to the quality of the work it had done. Its insufficiency, however, was not apparent upon inspection, and could not have been discovered by the subcontractor until actually tested during the erection of the bridge. It was held that the law implied a warranty that the work sold or transferred to the subcontractor was reasonably sufficient for the purposes for which the company knew it was designed. In the opinion Mr. Justice Harlan said: "According to the principles of decided cases, and upon clear grounds of justice, the fundamental inquiry must always be whether, under the circumstances of the particular case, the buyer had the right to rely and necessarily relied on the judgment of the seller and not upon his own. In ordinary sales the buyer has an opportunity of inspecting the article sold; and the seller not being the maker, and therefore having no special or technical knowledge of the mode in which it was made, the parties stand upon grounds of substantial equality. . . But when the seller is the maker or manufacturer of the thing sold, the fair presumption is that he understood the process of its manufacture, and was cognizant of any latent defect caused by such process and against which reasonable diligence might have guarded. This presumption is justified, in part, by the fact that the manufacturer or maker by his occupation holds himself out as competent to make articles reasonably adapted to the purposes for which such or similar articles are designed."

In DeWitt v. Berry, 134 U. S. 306 (10 Sup. Ct. 536, 33 L. ed. 896), a quantity of varnish was sold under a written contract containing the following express warranty as to quality: "these goods to be exactly the same quality as we make for the DeWitt Wire Cloth Company of New York, and as per sample bbls. delivered." "Turpentine copal varnish, at 65 ¢. per gallon. Turpentine Japan dryer, at 55 ¢. per gallon." There was no evidence that the goods were not of the same quality as those made for the DeWitt Wire Cloth Company, nor that they did not conform to the sample. It was accordingly held that this language fixed a definite standard for the determination of the quality of the goods, and excluded an

implied warranty or agreement that they should conform to a common commercial standard, and should be adapted to the known uses of the vendee.

In Seitz *v.* Brewers' Refrigerating Machine Co., supra, the refrigerating company sued Seitz for the purchase-price of a refrigerating machine under a written contract which specified that the vendor agreed to supply Seitz with a number 2 size refrigerating machine as constructed by the refrigerating company, which was to be put up in the brewery of Seitz under the superintendence of a competent man furnished by the company. Among other things, the defendant pleaded, that the plaintiff represented that the machine was capacitated to cool certain rooms in the brewery which had been examined by the plaintiff, but that when set up and operated it was not so capacitated and failed to perform the work for which, upon the representations of the plaintiff, the machine had been contracted for by the defendant; that the defendant contracted to purchase the machine upon the guarantee by the plaintiff that it would cool certain rooms, and upon the representation that the No. 2 machine was capable of cooling a space of 150,000 cubic feet of air continuously to a temperature sufficiently low for the purpose of brewing or manufacturing beer; but that the plaintiff knew that these representations were false and unfounded. Mr. Chief Justice Fuller in delivering the opinion said, that there was no evidence to sustain the allegations of fraud, but that it was contended that under the amended answer the defendant was entitled to avail himself of the breach of the contract of warranty or guaranty collateral to the contract of purchase and sale or of the implied warranty that the machine should be fit to accomplish a certain result; and that, assuming the sufficiency of the pleading on this question, there was no error on the part of the trial judge in directing a verdict in favor of the plaintiff. It was held that as the contract specifically called for a No. 2 size refrigerating machine, the plaintiff was entitled to such a machine, and that there was no implied warranty that it would cool a given space; in other words, that it would *"answer the particular purpose intended by the buyer."* A careful examination of that case will show, however, that while there was no implied warranty that the number 2 refrigerating machine would cool 150,000 cubic feet of atmosphere to 40 degrees Fahrenheit, it was not held that a refriger-

ator improperly constructed or having latent defects so as to prevent its operating as a proper number 2 machine could be furnished, without liability on the part of the vendor. When the purchaser obtained a number 2 machine, he could not complain that it did not do the work of a larger machine; but he could have complained if it failed, on account of latent defects, to operate properly as a number 2 machine should. Whether called a term of the contract or an implied warranty, the purchaser of a number 2 machine was entitled to such a machine, not in name only, but in reality and substance; and if it was made and bought for the purpose of refrigerating as a number 2 machine, he could set up that it failed to be reasonably suited for that purpose, though he might not set up that it failed to accomplish the purposes intended by him. In the opinion Mr. Chief Justice Fuller showed that he recognized this distinction. He stated: "It is not denied that the machine was constructed for refrigerating purposes, and that it worked and operated as a refrigerating machine should; but it is said that it did not so refrigerate as to reduce the temperature of the brewery to 40° Fahrenheit, or to a temperature which would enable defendant to dispense with the purchase of ice." And again: "In the case at bar the machine purchased was specifically designated in the contract, and the machine so designated was delivered, put up, and put in operation in the brewery. The only implication in regard to it was that it would perform the work the described machine was made to do, and it is not contended that there was any failure in such performance." See also General Fireproofing Co. v. Wallace, 175 Fed. 650 (9 C. C. A. 204).

In the case at bar it was alleged, that the vendor was a manufacturer of copper wires; that the vendee purchased wires for the purpose of using them for the transmission of electric power, with the knowledge of the vendor; that the purchaser did not have the opportunity for examination in advance, and, in effect, that there were latent defects in the construction of the wire which rendered it unsuited for the purpose for which it was manufactured and furnished. The mere fact that the size and conductivity of the wire were specified in the contract did not cover the entire subject of its qualities and suitability for use in the transmission of electric power, nor did it exclude the implied warranty on that subject. This is an entirely different thing from attempting to set up addi-

tional express warranties by parol, or that the wire of a particular size should do the work of a wire of a larger size or conduct all the electricity which the purchaser might desire to put upon it. Such things would not be warranted under the rule just discussed, that where a known, described, and definite thing is supplied, there is no warranty that it shall answer the particular purpose intended by the buyer; but this rule would not authorize a manufacturer of wire to be furnished for conducting electricity, merely because the diameter and conductivity of such wire is specified, to send it in fragments of a few feet in length which would be entirely unsuitable for use in conducting power for any distance. Nor would it authorize a manufacturer to furnish copper wire so improperly constructed and so full of concealed defects that it would not be reasonably suited for use as copper wire of that size. Whether called a term of the contract, or implied warranty, when a manufacturer undertakes to manufacture and sell copper wire for conducting electrical power, and the size and conductivity are given, he does not warrant that it will perform all the service which the purchaser may intend or expect it to do; but he does impliedly warrant that the wire which he furnishes is, in substance as well as in name, copper wire of the designated size, suitable for the transmission of electricity, and not full of latent defects.

From what has been said, it will be seen that the general demurrer was properly overruled. The rulings in the other headnotes need no elaboration.

*Judgment reversed. All the Justices concur.*