**LOMBARD CORPORATION, Appellant,**

v.

**QUALITY ALUMINUM PRODUCTS CO.,**
**Appellee.**

**No. 13450.**

United States Court of Appeals
Sixth Circuit.

Dec. 8, 1958.

Franklin B. Powers, Youngstown, Ohio (Donald J. Libert, of Manchester, Bennett, Powers & Ullman, Youngstown, Ohio, on the brief), for appellant.

Frank H. Feingold, Max A. Samolar, of Persky & Loeb, Cleveland, Ohio, for appellee.

Before ALLEN, Chief Judge, and SIMONS and MILLER, Circuit Judges.

ALLEN, Chief Judge.

This appeal seeks reversal of a judgment of the District Court finding that defendant,[1] who sold to plaintiff an aluminum extrusion press, had breached the implied warranty of fitness under

avoid an exclusionary clause similar to those in the policies now in suit.

1. The parties will be denominated as in the court below.

1315.16(F), O.R.C., and awarding damages therefor.

The material facts are not in dispute and are as follows:

Defendant, a designer and builder of heavy equipment, in 1953 sold plaintiff a hydraulic aluminum extrusion press weighing about 85 tons and having a 1,500 ton capacity. The reasonable or expected life of the machine was ten years. The amount paid was $114,494. The installation of the press at plaintiff's plant was supervised by defendant's erecting engineer, who for a week instructed plaintiff's employees how to operate the press.

The machine is capable of exerting a force of 1,500 tons on a billet inserted therein for extrusion. The operation of the press may be briefly described as follows: an electric motor drives pumps which pump oil through pipes into a cylinder in which a ram or piston moves back and forth. The pressure of the oil against the piston creates a force on the cross-head which moves forward and engages a heated billet, causing the billet to swell and fill the billet container, from which it passes into the die.

Parts of the press particularly important here are the cylinder housing in the middle rear part and a platen located in the front. The force tends to move the front platen slightly away from the cylinder housing. In order to limit this motion four tie rods or columns, each weighing some 3,300 pounds, are located on the machine, two at the top and two at the bottom, extending from the cylinder housing to the front platen. The tie rods combined have a resisting force of 1,500 tons. The various parts of the press must be properly aligned and centered. The faces of the cylinder housing and of the platen must be parallel. Also, the load must be applied on the exact center of the tie rods. Among other things the stem, the billet container and the die must at all times be maintained on the exact center of the press. If concentric loading and proper alignment exist at all times the force will be equally distributed between the four tie rods.

Each rod is threaded at both ends and is attached to the platen by four nuts, the two outside nuts being locked during the operation. The diameter of the rods is 8¾ inches on the outside and 8 inches at the root of the threads. The rods are constructed of Society of Automobile Engineers 41–40 quality steel. 41–40 is a symbol adopted by the Society of Automobile Engineers to designate a medium carbon alloy steel containing manganese, chromium and molybdenum plus carbon, with a yield point of 70,000 pounds per square inch. The yield point is the critical point at which, due to continued and recurring stresses and strains, the metal takes on permanent deformation and eventually may fracture. The unit load was computed to be approximately 14,900 pounds per square inch of cross-sectional area. It was therefore calculated that the 41–40 steel employed in the rods with its 70,000 pound yield point afforded a safety factor of 4.7 to 1.

Plaintiff introduced evidence that it operated the machine normally in accordance with defendant's instructions and this was conceded by defendant's witnesses. For some nine months the press operated satisfactorily and then two of the tie rods broke, the break occurring at the root of the threads where the surface of the nut and the surface of the front platen engage. Defendant's expert witness stated that the root of the thread is always considered the weakest part of the rod and defendant's counsel concedes that this is the point where the tie rod would be expected to break.

As defendant was unable promptly to deliver replacement rods and plaintiff had many orders requiring prompt delivery, plaintiff remachined the original rods, shortening them, attaching half of a nut on each end, and replacing the rods in the same location as before. The outside nuts could not be locked, as they were originally, but by maintaining a vigilant check on alignment the press was operated satisfactorily for some ten months, the alignment being adjusted three or four times. Then two of the rods broke, the break again occurring at

the root of the threads. It was shown that if one tie rod broke the press could not function. A new set of rods was built and installed, not by defendant but by another manufacturer. The new installation in all respects, including diameter of the rods, location, etc., conformed to the same design as that of the original machine except for the fact that the new rods were made of S. A. E. 43–40 steel. This has a higher tensile strength than 41–40 steel and it was conceded that it would afford a higher safety factor. Fifteen months later two of the new rods broke, the break once more occurring at the roots of the threads at the face of the platen where the nut meets the platen.

Plaintiff had made known to defendant the purpose for which the machine was to be used, namely, the constant extruding of aluminum, and relied upon defendant's superior skill and judgment. Therefore plaintiff based its action upon the implied warranty existing in such cases, that "goods shall be reasonably fit for" the purpose for which they were bought. Section 1315.16(A), Ohio R.C. An express warranty of material and workmanship made between the parties at the time of the sale had expired before the first breaking of the tie rods. Plaintiff conceded that there was no substantial defect in the material or workmanship of the rods. In the lower court defendant contended that the express warranty excluded the implied warranty under the terms of the Sales Act and the applicable law. However, the District Court held that the implied warranty of fitness was not inconsistent with the express warranty as to material and workmanship and that, therefore, under Section 1315.16(F), O.R.C., the implied warranty was in force. See 164 A.L.R. 1346, which states that, generally speaking, the express warranty against defective materials and workmanship "will not be held to exclude an implied warranty of fitness * * *." John A. Roebling's Sons Company v. Southern Power Company, 142 Ga. 464, 83 S.E.

138, L.R.A.1915B, 900; J. B. Colt Company v. Asher, 239 Ky. 235, 39 S.W.2d 263; National Cash Register Company v. Layton, 207 Mo.App. 454, 232 S.W. 1091. The court declared in effect that the tensile strength, both of the original and of the new rods, was inadequate to withstand the concentration of stresses at the roots of the threads during normal operation of the press and resulting metal fatigue, and that this constituted faulty design in violation of the warranty of fitness.

We no do not discuss at length defendant's contention below, that the express warranty excluded the implied warranty, for in this court defendant concedes that there may be instances where an implied warranty governs, even though an express warranty of materials and workmanship exists. However, defendant contends that here the express warranty does negative the implied warranty of fitness, 1315.16(F), O.R.C., because the defect in design, if it existed, arose from a defect in material or workmanship, causing the rods to break. Freedom from defects in material and workmanship was the subject of the express warranty.

The difficulty with this contention is that no evidence of defective material or workmanship appears. Plaintiff's admission that the material and workmanship were not defective is supported by the record. A defect in material is a defect in quality. The steel in the tie rods was of excellent quality. A defect in workmanship is a defect in the way some part of the machine is constructed. The construction of the rods was not shown to be improper.

Design, on the contrary, involves the overall plan of construction and operation. Here the basis asserted for the action was that, due to faulty design, a press which defendant in open court stated was capable of extruding 1,500 tons for "continuous duty", was not adequate to execute the purpose for which it was bought. It was claimed that defendant had not properly figured the

tensile strength, either in the diameter of the rods or in the type of steel used, necessary to develop a safety factor high enough so that the machine would withstand the continuous recurring strains and stresses of the extrusion. The District Court based its judgment upon this point and substantial evidence supports its conclusion.

The coincidence in the periods which existed between each of the three breaks is significant. The design, the overall plan of construction and operation, had not been changed after the second break. Also, the overall plan in effect was the same in material respects even after the first break. The material and workmanship being satisfactory, the design was shown to be connected with the breaks. The selection of the proper diameter for the rods and of the proper type of steel for the rods was, in fact, a part of the design of the machine.

Defendant urges that the District Courts' conclusion that the breaks were caused by faulty design is not in accord with the facts. It claims that, since the machine operated satisfactorily for nine months, the condition of unfitness did not exist at the time of the sale, when the implied warranty, if applicable, arose. However, defendant's own witnesses testified that a condition making for excessive strain might exist for a period prior to the fracture of some part. The breaking might be gradual. If, as found by the District Court, the design was actually faulty, this condition existed at the time of the installation, for the diameter of the rods was not changed and the arrangment or plan of the construction in which they operated was not changed, not even when plaintiff secured rods from another manufacturer than defendant.

Substantial evidence, mainly undisputed, supports this conclusion. Plaintiff's president, Silver, a qualified engineer, examined the rods after the first break. He testified that the rods were sufficiently strong, but the fact that the stresses were tight against the platen face caused a concentration of stress on a very small area, which was not sufficient to stand the stress at that point. He said that the steel in the middle of the rod had a safety factor of "six or seven or eight" but that at the threads there was possibly a safety factor of not more than one and a half to one. In the course of operation the metal, being pushed and pulled, being put under tension and relieved, then again repeatedly put under tension and relieved, became fatigued. Silver pointed out that the outside layer of fibers carries the maximum load, that the outside fibers were stretched more than the inside fibers, in case of any eccentric loading or misalignment which always exists, he said, to a very slight degree. He testified that the outside fibers suffer fatigue due to the fact that they are roughly machined; that the rod hangs with no support between the front platen and the rear platen and by deflection bends "a little bit". The engineer, Silver said, must allow enough safety factor to take into account the fact that the outside fibers become fatigued. The break was caused, in his opinion, because the safety factor allowed for in designing the machine was not adequate to protect against the fractures that were reasonably to be expected from the normal use of the machine. If the threads had been made bigger in diameter at the end, Silver testified, the rods would not have broken. He said the rods should have been about $9\frac{1}{2}$ inches in diameter at that point.

This statement was supported by Poleschuk, a sales engineer of the manufacturer who built the third set of rods. This manufacturer produces an extrusion press of 1,400 tons capacity, slightly smaller than the press involved here. Poleschuk said it was the view of his company that a rod of $9\frac{1}{4}$ inches was "the minimum size that we could put in." Defendant itself testified that an increase of one inch at the root of the rod would increase the safety factor by 20% to 25%.

It was shown that a higher grade of steel with more tensile strength would

withstand a much heavier stress than the 41–40 steel. Such a material is the 5–H–50 Heppenstahl steel.

While defendant stated that its design was adequate, it did not specifically controvert the facts upon which plaintiff's president based his conclusions. Although defendant's vice president examined the machine after the first break, he said that he did not know what had caused the fracture. The operation was manual, requiring manipulation of seven levers by the operator. Defendant pointed out that, if any lever was operated in wrong sequence or otherwise improperly, misalignment or eccentric loading would result, but no evidence of such occurrences at plaintiff's plant was presented.

Defendant also urges that the judgment requires it to be an insurer of the operation. This was not the conclusion of the court. It was not disputed that the expected life of the machine was ten years. The court concluded, and defendant concedes, that the time covered by the implied warranty is a reasonable time. In effect the court found that the machine did not operate, in light of all the circumstances, for a reasonable time. It declared that the parties did not contemplate the sale or purchase of a press equipped with tie rods incapable of resisting the stresses of normal operation for more than nine months.

Defendant attacks the court's holding on this point upon the ground that the contemplation of the parties cannot be resorted to in decision of the question. But the statute specifically makes the contemplation of the parties material, for it provides that the implied warranty of fitness arises where the buyer makes known to the seller the purpose for which the machine is to be used and relies upon the seller's superior skill and judgment. Bearing in mind the sale price of the press, $114,494, we think the finding was amply sustained by the evidence.

All questions presented have been considered but we deem it unnecessary to discuss them further. The court did not err with reference to the measure of damages applicable to the case presented. Williston on Sales III, Section 613, pages 366–7; Section 1315.16, O.R.C.

The judgment of the District Court is affirmed.