**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2933
_____

GALO COBA; COBA LANDSCAPING AND
CONSTRUCTION, INC., individually, and on behalf of other
members of the general public similarly situated,

Appellants

v.

FORD MOTOR COMPANY
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-12-cv-01622)
District Judge: Honorable Kevin McNulty
_____

Submitted Under Third Circuit LAR 34.1(a)
January 23, 2019

Before: JORDAN, KRAUSE, and ROTH, *Circuit Judges*

(Opinion Filed: July 26, 2019)

John E. Stobart
Ryan Wu, I
Capstone Law
1875 Century Park East
Suite 1000
Los Angeles, CA 90067

*Counsel for Appellant*

Robert M. Palumbos
Andrew R. Sperl
Duane Morris
30 South 17th Street
United Plaza
Philadelphia, PA 19103

John M. Thomas
Dykema
2723 South State Street
Suite 400
Ann Arbor, MI 48104

Karol C. Walker
LeClairRyan
1037 Raymond Boulevard
One Riverfront Plaza, 16th Floor
Newark, NJ 07102

        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

        Problematic as a lemon of a vehicle may be, the problem becomes more complex when it is peeling. This appeal involves a putative consumer class action seeking damages resulting from the delamination, i.e., peeling and flaking, of the lining of certain Ford truck fuel tanks between 2001 and 2010—a problem that plagued numerous Ford F-Series and E-Series vehicles in multiple countries and that, according to Appellant Galo Coba, Ford knew stemmed from a defect. It requires us to resolve two open questions for our Court: first, whether a district court's denial of class certification divests the court of jurisdiction in a case where its jurisdiction was predicated solely on the Class Action Fairness Act, 28 U.S.C. § 1332(d); and second, whether a warranty that covers only defects in "materials or

2

workmanship" extends to design defects under New Jersey common law. We must also evaluate whether a reasonable jury could conclude on this record that Ford knew the alleged fuel-tank defect was the cause of the delamination problem at the relevant time.

Because we conclude that the District Court properly exercised its jurisdiction, that the materials-or-workmanship warranty did not cover design defects, and that the record evidence of Ford's knowledge about the defect does not create a triable issue, we will affirm the District Court's entry of summary judgment in favor of Ford on all of Coba's claims.

## I. Background

### A. Ford's Fuel Tank Troubles

Beginning in 2001 and continuing over the decade that followed, Ford received waves of complaints from customers who purchased certain F-Series and E-Series vehicles reporting similar types of malfunction related to their vehicles' fuel tanks. The fuel tanks used in certain vehicle models were susceptible to a problem known as "delamination," whereby particles of the tank lining would separate from the underlying metal and mix with the vehicle's fuel. As the fuel carrying those particles makes its way through the vehicle's fuel system, the particles can clog the fuel filter, which constrains fuel flow to the engine and reduces power. The particles can also damage fuel-system components, such as injectors. If left untreated, the problem eventually may lead to difficulties starting the engine or keeping the vehicle running.

In 2001, when Ford first received reports that some of its vehicles were exhibiting fuel-tank delamination problems, the complaints came exclusively from customers in Brazil. Over the next few years, cases of delamination cropped up in the United States, though they were largely clustered in certain regions. For example, as of January 2004, forty-three of the eighty-six warranty claims submitted to Ford that related to delamination had come from customers in Ohio. Because of the geographically concentrated occurrence of the delamination complaints, both Ford and the supplier of its

3

fuel-tank coatings, Magni Industries, Inc., suspected that unique qualities in regional fuel supplies were to blame for delamination. In particular, as Ford investigated, its suspicions gravitated toward fuel containing excessive concentrations of biodiesel, which Ford recommended against using because its tanks were not authorized to withstand biodiesel concentrations over 5%. That theory was consistent with Ford's data in some respects because Brazil, where the problem started, did not have established biodiesel regulations until 2005.

Although Ford could not confirm that biodiesel was the culprit—and Ford's engineers sometimes questioned the biodiesel hypothesis in light of inconclusive testing—Ford's leads were compelling enough that it started working with Magni in 2005 to develop a more biodiesel-resistant coating. And by February 2007, Ford released an improved coating, called "A35," to replace the prior "A36" coating in F-Series Super Duty trucks. Around the same time, Ford sent a message to dealers notifying them about the release of the new tank coating and explaining that fuel tanks in certain Ford trucks had delaminated, which Ford attributed to "the use of fuels containing concentrations of bio-diesel greater than recommended by Ford (5%)." App. 86.

Ford's warranty claims did drop after the release of the A35 coating, but some reports of delamination persisted. Having not fully solved the problem, Ford continued its investigation. And by 2010, Ford's Materials Engineering department came to believe that biodiesel was not the root cause after all; instead, acetic and formic acids—which Ford discovered in fuel samples from service station pumps near a dealer that encountered numerous delamination complaints—were more likely the cause all along.

### B.  Coba's Lawsuit

Galo Coba, the plaintiff in this case, is one of the Ford-vehicle customers whose fuel tanks delaminated. He purchased two Ford 2006 F-350 Super Duty 6.0L diesel dump trucks for his landscaping business, Coba Landscaping and Construction, Inc. He bought the first in October of 2006 and the second in March of 2007. By March of 2009, both trucks began exhibiting signs of tank delamination. According to

Coba, the engines would misfire, the trucks lacked power when driven up hills, the fuel filters were contaminated with fuel-tank debris, and the fuel systems rusted.

He brought the trucks into a Ford dealership, which replaced the fuel tanks and fuel filters in both trucks at no cost to Coba. Despite the repairs, Coba had the same problems over and over again, needing additional replacements each time. Altogether, Coba replaced the fuel tank twice in his older truck and three times in his newer truck. Because several of the replacements occurred after the trucks' warranties had expired, Coba spent several thousand dollars on the fixes.

Coba filed this class-action lawsuit against Ford Motor Company in March of 2012. As amended, the operative complaint asserts claims for breach of express warranty, violation of the New Jersey Consumer Fraud Act (NJCFA), and breach of the duty of good faith and fair dealing.[1] Although Ford had replaced several of Coba's fuel tanks under warranty, Coba alleges that Ford breached its written warranty—the New Vehicle Limited Warranty (NVLW)—by failing to adequately repair and replace his tanks, as the replacements turned out to have the same defects as his original tanks. The thrust of the implied-covenant-of-good-faith-and-fair-dealing claim is that when Ford repaired Coba's vehicles, it knew that the repairs would not solve Coba's delamination problems. Finally, Coba's NJCFA claim rests on allegations that Ford purposefully failed to disclose to Coba and other customers the defect in its fuel tanks.

The District Court entered summary judgment in Ford's favor on all of Coba's claims. *See Coba v. Ford Motor Co.*, No. 12-1622, 2016 WL 5746361, at *13–14 (D.N.J. Sept. 30, 2016); *Coba v. Ford Motor Co.*, No. 12-1622, 2017 WL 3332264, at *11 (D.N.J. Aug. 4, 2017). This appeal followed.

---

[1] It also asserts a common law fraud claim, which Coba is no longer pursuing.

## II. Discussion

### A. Jurisdiction

We address a threshold issue of jurisdiction before turning to the merits of the District Court's decision. While our jurisdiction to hear Coba's appeal is clear under 28 U.S.C. § 1291, the propriety of the District Court's jurisdiction is less straightforward and an issue we must address at the outset.

The District Court initially exercised jurisdiction over Coba's suit—a class action asserting state-law claims—pursuant to the Class Action Fairness Act (CAFA), which gives district courts "original jurisdiction of any civil action in which the matter in controversy exceeds . . . $5,000,000 . . . *and is a class action* in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d) (emphasis added). But when the District Court entered summary judgment on three of Coba's four claims in September of 2016, it simultaneously denied Coba's motion for class certification as moot even though it had not yet disposed of the NJCFA claim. Because § 1332(d) provides original jurisdiction only over "class action[s]," that ruling raises the question whether the District Court still had jurisdiction when it entered its final summary judgment order in August of 2017. Thus, before we address the merits of this appeal, we must consider an issue of first impression for our Court: If a federal court properly exercises jurisdiction pursuant to § 1332(d) at the time a claim is filed or removed, does a subsequent denial of class certification divest the court of subject-matter jurisdiction?

In accordance with every other Circuit Court to address this question, we conclude that it does not.[2] We start

---

[2] *See F5 Capital v. Pappas*, 856 F.3d 61, 75–77 (2d Cir. 2017); *Louisiana v. Am. Nat. Prop. Cas. Co.*, 746 F.3d 633, 639–40 (5th Cir. 2014); *Metz v. Unizan Bank*, 649 F.3d 492, 500–01 (6th Cir. 2011); *Buetow v. A.L.S. Enters., Inc.*, 650 F.3d 1178, 1182 n.2 (8th Cir. 2011); *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. Shell Oil Co.*, 602 F.3d 1087, 1089 (9th Cir. 2010); *Cunningham Charter Corp.*

with the text: District courts have "original jurisdiction" over "class action[s]," 28 U.S.C. § 1332(d)(2), which the statute defines as "civil action[s] *filed under* [R]ule 23 . . . or [a] similar State statute or rule of judicial procedure authorizing an action to be brought . . . as a class action," *id.* § 1332(d)(1)(B) (emphasis added). This conferral of jurisdiction plainly encompasses a suit like Coba's, which was "filed under [R]ule 23," notwithstanding its eventual failure to become certified under Rule 23. *See Metz v. Unizan Bank*, 649 F.3d 492, 500 (6th Cir. 2011) ("The 'filed under' language shows that it is the time of filing that matters for determining jurisdiction under CAFA."); *Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 806 (7th Cir. 2010) (noting that § 1332(d)(1)(B) "defines class action as a suit filed under a statute or rule authorizing class actions, even though many such suits cannot be maintained as class actions because the judge refuses to certify a class"). Indeed, "[h]ad Congress intended that a properly removed class action be remanded if a class is not eventually certified, it could have said so." *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. Shell Oil Co.*, 602 F.3d 1087, 1091 (9th Cir. 2010).

True, § 1332(d)(8) states that CAFA "shall apply to any class action before or after the entry of a class certification order by the court with respect to that action," but, as the Seventh Circuit has aptly noted, that subsection refers to "a" certification order, not "the" certification order, and the former connotes an indefinite expectation that a certification order may issue. *Cunningham*, 592 F.3d at 806 (explaining that subsection (d)(8) at most suggests that a class "*may* be certified eventually" (emphasis added)). Moreover, unlike subsection (d)(2), subsection (d)(8) omits reference to "jurisdiction," indicating it pertains not to the scope of jurisdiction conferred by the statute, but to the timing of certification in relation to removal. *See id.*

---

*v. Learjet, Inc.*, 592 F.3d 805, 806–07 (7th Cir. 2010); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 n.12 (11th Cir. 2009).

Beyond CAFA's text, general jurisdictional principles also support our conclusion that the denial of class certification did not divest the District Court of jurisdiction over the NJCFA claim. Typically, "[j]urisdictional facts are determined at the time of removal [or filing], not by subsequent events." *Louisiana v. Am. Nat'l Prop. Cas. Co.*, 746 F.3d 633, 635 (5th Cir. 2014); *accord Cunningham*, 592 F.3d at 807; *Metz*, 649 F.3d at 500–01; *United Steel*, 602 F.3d at 1091–92. Of course, that principle is not absolute. *See Cunningham*, 592 F.3d at 807 (discussing exceptions, such as mootness doctrine); *United Steel*, 602 F.3d at 1092 n.3 (same). However, as Congress did not make any exception here, it seems "likely that Congress intended that the usual and long-standing principles apply—post-filing developments do not defeat jurisdiction if jurisdiction was properly invoked as of the time of filing." *Id.* at 1091–92.

Assured of the District Court's jurisdiction, we turn to the merits of the District Court's summary judgment ruling.

### B. The District Court's Grant of Summary Judgment

On appeal, Coba challenges the District Court's grant of summary judgment on his claims for breach of express warranty, breach of the implied covenant of good faith and fair dealing, and violation of the NJCFA. We review those rulings de novo. *See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). Viewing the evidence "in the light most favorable" to Coba as the non-moving party, *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014), we consider whether Ford has shown "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). We address each claim in turn.

### 1. Breach of Express Warranty

The District Court entered summary judgment on Coba's breach-of-express-warranty claim because it determined that the fuel-tank defect at issue was outside the scope of Ford's written warranty, the NVLW. The District Court reasoned (1) that the NVLW—which provides that Ford will "repair, replace, or adjust all parts on [his] vehicle

that are defective in factory-supplied materials or workmanship," App. 248—covers only "materials or workmanship" defects, not design defects, and (2) that the fuel-tank defect alleged by Coba fell in the design-defect category. We agree on both points.[3]

### a. A Warranty for Defects in "Materials or Workmanship" Does Not Encompass "Design" Defects

New Jersey law, which governs our interpretation of the NVLW, *see Collins v. Mary Kay, Inc.*, 874 F.3d 176, 181–82 (3d Cir. 2017), does not specifically address whether a warranty for "materials or workmanship" covers "design" defects. In the absence of any guidance from New Jersey courts on this particular issue, we "must predict how [New Jersey's] highest court would decide [it]" based upon "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would

---

[3] Coba contends that we cannot affirm on these grounds because Ford did not argue that design defects were excluded from the NVLW's coverage, and the District Court did not provide notice to Coba that it was considering these grounds sua sponte. *See* Fed. R. Civ. P. 56(f)(2) ("After giving notice and a reasonable time to respond, the court may . . . grant the motion [for summary judgment] on grounds not raised by a party . . . ."); *see also Couden v. Duffy*, 446 F.3d 483, 500 (3d Cir. 2006). But here, Ford did request summary judgment on these grounds. *See* Ford Motor Company's Memorandum in Support of Motion for Summary Judgment at 36 n.4, ECF No. 130-1 at 70 (Sept. 18, 2015). While Ford did not flesh out the argument in detail in its summary judgment briefing, it did make reference to the District Court's extensive discussion of that very issue, which was sufficient to raise the argument. *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 262 (3d Cir. 2009) (recognizing that the relevant question as to waiver is whether a party "presented the argument with sufficient specificity to alert the district court").

9

decide the issue at hand." *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 46 (3d Cir. 2009).

We start with general principles of contract interpretation under New Jersey law and give the terms of the NVLW their "plain and ordinary meaning." *M.J. Paquet, Inc. v. N.J. Dep't of Transp.*, 794 A.2d 141, 152 (N.J. 2002). If those terms are unambiguous, resolution by summary judgment is appropriate. *See Michaels v. Brookchester, Inc.*, 140 A.2d 199, 204 (N.J. 1958) (holding that "the construction of a written agreement is a matter for the court," not a jury, unless "its meaning is uncertain or ambiguous").

The plain and ordinary meaning of the term "defect[s] in . . . materials or workmanship," App. 248, unambiguously excludes "design" defects. As an initial matter, the plain definitions of "workmanship" and "materials" are conceptually distinct from the definition of "design." "Workmanship" is the "the execution or manner of making or doing something," *Webster's Third New International Dictionary* 2635 (1993),[4] and "materials" are the "the basic matter (as metal, wood, plastic, fiber) from which the whole or the greater part of something physical (as a machine, tool, building, fabric) is made," *id.* at 1392. Both definitions relate to the execution phase of making an object and connote the physical realization of something. By contrast, the definition of "design"—"a preliminary sketch or outline (as a drawing on paper or a modeling in clay) showing the main features of something to be executed," *id.* at 611—relates to the preparation stage that guides, and precedes, execution.[5] Thus,

---

[4] The New Jersey Supreme Court regularly relies on this dictionary and other versions of it when determining the plain and ordinary meaning of terms. *See, e.g.*, *State v. Tate*, 106 A.3d 1195, 1204 (N.J. 2015); *Highland Lakes Country Club & Cmty. Ass'n v. Franzino*, 892 A.2d 646, 657 (N.J. 2006); *Exxon Corp. v. Hunt*, 481 A.2d 271, 275 (N.J. 1984), *rev'd on other grounds*, 475 U.S. 355 (1986).

[5] While "workmanship," "materials," and "design" each have multiple alternative definitions, we only highlight the definitions that are most relevant to the context of the issue before us, i.e., product development. But these words'

10

in the context of product development, defects in "workmanship" and "materials" are flaws pertaining to the construction or manufacture of a product, while defects in "design" are shortcomings that arise in the plans for a product's creation. More specifically, a "materials" defect is a failing in the quality of the actual substances used to make a product, *see Hammel v. Van Sickle*, 128 A. 247, 248 (N.J. 1925) (per curiam); a "workmanship" defect is a deficiency in the execution of a product's assembly or construction, *see Henningsen v. Bloomfield Motors, Inc.*, 161 A.2d 69, 79 (N.J. 1960); and a "design" defect is a flaw inherent in the product's intended operation and construction, *see O'Brien v. Muskin Corp.*, 463 A.2d 298, 304 (N.J. 1983).[6]

Historical practice in products liability litigation, dating back more than a century, reflects a consistent understanding of the distinctions among these categories. *See, e.g.*, *Lombard Corp. v. Quality Aluminum Prod. Co.*, 261 F.2d 336, 338 (6th Cir. 1958) ("A defect in material is a defect in quality. . . . A defect in workmanship is a defect in the way some part of the machine is constructed. . . . Design, on the contrary, involves the overall plan of construction and operation."); *Moss v. Smith*, 185 P. 385, 385 (Cal. 1919) ("It is conceded that the engine and clutch of the automobile in question were defective, but the appellants claim that the

---

other definitions would not alter our reasoning; if anything, they strengthen the meaning we ascribe to them. *See, e.g.*, *Webster's Third New International Dictionary* 2635 (1993) (defining "workmanship" as "the quality imparted to a thing in the process of making"); *id.* at 1392 (defining "materials" as "the finished stuff of which something physical (as an article of clothing) is made"); *id.* at 611 (defining "design" as "a mental project or scheme in which means to an end are laid down").

[6] Although not relevant to the issues we address today, we note that *O'Brien* was superseded by N.J.S.A. 2A:58C–3a(2) to the extent it concerns the "consumer expectations" doctrine. *Dewey v. R.J. Reynolds Tobacco Co.*, 577 A.2d 1239, 1252 (N.J. 1990).

11

defects were those of design instead of material or workmanship.").[7]

In light of this common law, it is unsurprising that courts have regularly rejected arguments like Coba's that a design defect is within the scope of a materials-and-workmanship warranty clause. *See, e.g.*, *Bruce Martin Constr., Inc. v. CTB, Inc.*, 735 F.3d 750, 753–54 (8th Cir.

---

[7] *See also S. Gas & Gasoline Engine Co. v. Adams & Peters*, 198 S.W. 676, 677 (Tex. Civ. App. 1917), *rev'd on other grounds*, 227 S.W. 945 (Tex. Comm'n App. 1921) ("A careful examination of the voluminous testimony of the witness . . . discloses that there was much of it that went to other matters than mere defects in the design or plan of the engine and its various parts, that is, to defects in workmanship and material . . . ."); *Dalton Adding Mach. Sales Co. v. Denton*, 234 P. 201, 203 (Okla. 1925) (debating whether a warranty covers only "defective materials and workmanship" or also covers defects of "design"); *Murdock v. A. A. Sutain, Ltd.*, 147 N.Y.S.2d 429, 431 (Sup. Ct. 1955) ("[T]he materials and workmanship were inferior. The design, however, was the same . . . ."); *Simmons v. Gibbs Mfg. Co.*, 170 F. Supp. 818, 822 (N.D. Ohio 1959) ("[T]he criticism of the expert related only to the design of the top, and not to the materials and workmanship."); *Shelby Mut. Ins. Co. of Shelby, Ohio v. Ferber Sheet Metal Works, Inc.*, 156 So. 2d 748, 749 (Fla. Dist. Ct. App. 1963) ("[I]n his opinion the roof developed the leak because of faulty design of the flashing rather than due to the materials and workmanship furnished by appellee, and . . . the architect on the job was responsible for the design . . . ."); *Totten v. Gruzen*, 245 A.2d 1, 5 (N.J. 1968) ("[L]iability may rest on architects and engineers on the basis of improper design as well as on contractors for defective materials, equipment and workmanship."); *Falcon Tankers, Inc. v. Litton Sys., Inc.*, 300 A.2d 231, 234 (Del. Super. Ct. 1972) ("The [issue] is whether the language used in the guarantee clause limits damages so as to preclude damages for design defects (as opposed to defects in materials and workmanship) . . . .").

2013); *Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 526–27 (7th Cir. 2003); *Davidson v. Apple, Inc.*, No. 16-CV-04942-LHK, 2017 WL 976048, at *11–12 (N.D. Cal. Mar. 14, 2017); *Rollolazo v. BMW of N. Am., LLC*, No. CV 16-00966, 2017 WL 6888501, at *8–9 (C.D. Cal. May 2, 2017); *Robinson v. Kia Motors Am., Inc.*, No. 13-006, 2015 WL 5334739, at *12 (D.N.J. Sept. 11, 2015); *Nelson v. Nissan N. Am., Inc.*, No. CIV. 11-5712, 2014 WL 7331075, at *2–3 (D.N.J. Dec. 19, 2014); *Orthoflex, Inc. v. ThermoTek, Inc.*, No. 3:11–CV–0870–D, 3:10–CV–2618–D, 2013 WL 4045206, at *8 (N.D. Tex. Aug. 9, 2013); *Rice v. Sunbeam Prods., Inc.*, No. CV 12-7923, 2013 WL 146270, at *12 (C.D. Cal. Jan. 7, 2013); *Horvath v. LG Elecs. Mobilecomm U.S.A., Inc.*, No. 3:11-CV-01576-H-RBB, 2012 WL 2861160, at *5 (S.D. Cal. Feb. 13, 2012).

The two contrary district court decisions on which Coba relies do not persuade us otherwise. *Koulajian v. Trek Bicycle Corp.* provides almost no analysis to support its bare conclusion that a "warranty's reference to 'workmanship' could refer to . . . designs as well as to implementation of those designs," and thus, it offers nothing helpful for us to consider. No. 90-Civ-3156, 1992 WL 28884, at *2 (S.D.N.Y. Feb. 11, 1992). And the logic of *In re Saturn L-Series Timing Chain Products Liability Litigation* is that "design is integrated into each step of the manufacturing process and affects both materials and workmanship." MDL No. 1920, 2008 WL 4866604, at *15 (D. Neb. Nov. 7, 2008). That is true, but it misses the point: While a design might dictate what material or workmanship is required, it does not speak to their quality.

In short, we conclude that, under New Jersey law, a warranty that limits its coverage to defects in "materials" and "workmanship" does not, without more, apply to defects in "design." While parties are free to redefine words in their contracts in ways that deviate from plain and ordinary meaning, they did not do so here. "Materials" and

13

"workmanship" in the NVLW carry their plain meaning, and the warranty therefore does not extend to design defects.[8]

b. The Fuel Tank Defect Was a Design Defect

Having concluded that the NVLW does not cover design defects, we must determine whether the fuel-tank-delamination problem, as alleged, reflected a defect in design. We agree with the District Court that it does, so the court properly entered summary judgment on Coba's breach-of-warranty claim.

Accounting for the differences between design, materials, and workmanship defects, *see supra* Section II.B.1.a, the alleged flaw in Ford's fuel tanks has all the trappings of a design defect. The fundamental nature of the defect relates to the "overall plan of construction and operation" of the fuel tanks. *Lombard Corp.*, 261 F.2d at 338. The problem, as consistently described by Coba, was

_____

[8] Coba asserts that Ford's repeated replacements of Coba's fuel tanks constitute a course of performance that should be given "controlling weight" in interpreting these terms. Appellant's Reply Br. 5. It is true that, for contracts governed by New Jersey's Uniform Commercial Code, which Ford concedes is applicable, course of performance may be used to "explain[]" or "supplement[]" a written agreement's terms. *See* N.J. Stat. Ann. § 12A:2-202; *see also id.* § 12A:2-208. But, under the UCC, a meaning suggested by a course of performance is trumped by the express terms of an agreement. *See id.* § 12A:2-208(2) ("The express terms of the agreement and any such course of performance . . . shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance . . . ."). In any event, Ford's course of performance is not inconsistent with our interpretation of the NVLW: Its willingness to repair and replace some of Coba's malfunctioning fuel tanks without quibbling over whether and how the parts were defective appears motivated by a desire to retain customer goodwill rather than by an obligation to replace parts afflicted with design defects.

not a low-quality supply of the A35 and A36 coatings or a problem in the process for applying them to Ford's fuel tanks; rather, it was Ford's plan to use those coatings at all in constructing its fuel tanks.[9] And that flawed-design theory is consistent with the evidence on which Coba relies, including Ford's own conclusion in 2010 that tanks were delaminating because "the A36 and A35 fuel tank coatings cannot tolerate a constant supply of acetic and formic acids in fuel." App. 1203. It is also consistent with Coba's allegations that "[a]ll" of the vehicles manufactured this way suffer from a "common" issue, App. 83, and that the "root cause" of delamination was that "*all* of the tanks at issue, *as designed*, were susceptible to delamination" when exposed to certain acids, Memorandum in Support of Motion for Class Certification at 2, ECF No. 132 (Sept. 18, 2015) (emphasis added). *See Schwartz v. Volvo N. Am. Corp.*, 554 So.2d 927, 941 n.5 (Ala. 1989) (noting that a design defect exists when "every product of a line is defective" (emphasis omitted)); *cf. also Restatement (Third) of Torts: Prod. Liab.* § 2 (1998) (distinguishing design defects from "manufacturing defects," which occur where a "product departs from its intended design").

As Coba alleged a design defect, and the NVLW covered only materials and workmanship defects, the District Court properly granted summary judgment on Coba's breach-of-warranty claim.

### 2. *Breach of Covenant of Good Faith and Fair Dealing*

Because Coba did not have any right to repair or replacement of his fuel tanks under the NVLW, he also could not prevail on his claim for breach of the implied covenant of good faith and fair dealing. New Jersey recognizes an

---

[9] Although the allegations in Coba's complaint suggested that the fuel tanks might suffer from a "manufacturing defect," App. 83, the summary judgment record is devoid of any evidence supporting the existence of such a defect. And in neither his summary judgment briefing nor his briefing on appeal has Coba argued that the fuel tanks' manufacturing process was defective.

implied covenant of good faith and fair dealing in every contract, *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126 (N.J. 2001), but to state a claim that it was breached, a plaintiff must have "the right . . . to receive the fruits of the contract" and must show that the defendant had "improper motive" when interfering with that right, *Wade v. Kessler Inst.*, 798 A.2d 1251, 1259–60 (N.J. 2002) (citation omitted).

Here, Coba alleges that Ford breached the covenant of good faith and fair dealing implied in the NVLW by repairing and replacing his tanks, while "knowing that those repairs and replacements would not fix or remedy the [f]uel [t]ank [d]efect." App. 129. But even assuming Ford possessed an improper motive—a questionable notion given the evolving nature of Ford's knowledge of a design defect—the NVLW did not cover design defects, so tank repair and replacement were not "fruits of the [NVLW]" that Coba had a "right . . . to receive." *Wade*, 798 A.2d at 1259.

### 3.  New Jersey Consumer Fraud Act

To prove a violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8–1 to –210, a plaintiff must establish "that the defendant engaged in an unlawful practice that caused an ascertainable loss to the plaintiff," *Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) (citing *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462–65 (N.J. 1994)). There are three general types of "unlawful practices": "affirmative acts, knowing omissions, and regulation violations." *Id.* (quoting *Cox*, 647 A.2d at 462). A plaintiff asserting a claim based on an omission must demonstrate that the defendant "(1) knowingly concealed (2) a material fact (3) with the intention that plaintiff rely upon the concealment." *Judge v. Blackfin Yacht Corp.*, 815 A.2d 537, 541 (N.J. Super. Ct. App. Div. 2003); *see also* N.J. Stat. Ann. § 56:8-2.

Here, Coba's NJCFA claim rests on two theories, both predicated on omissions by Ford: (1) that Ford knew and did not disclose that the fuel tank suffered from a design defect that caused delamination, and (2) that even if Ford did not know the cause of the delamination, it failed to disclose the risk. The District Court held, as to the first, that Coba failed to put forth sufficient evidence of Ford's knowledge of the design defect, and, as to the second, that "the information

16

about the risk of delamination that Ford had available to it at the time [Coba purchased his trucks] was not material." *Coba*, 2017 WL 3332264, at *4–9. For the reasons explained below, we agree with both conclusions.

### a. Ford's Knowledge of the Design Defect

To prevail on the theory that Ford failed to disclose a known design defect, Coba would need to show that Ford had that knowledge at the time of his purchases—i.e., before March 9, 2007, when Coba purchased his second truck.

Viewing the evidence "in the light most favorable" to Coba, *Plumhoff*, 572 U.S. at 768, no reasonable jury could find Ford had that knowledge. Internal email correspondence shows that, as early as 2005, Ford knew that the problem had existed for several years and was investigating its cause. But the evidence does not show that Ford knew that the cause was the design of its tanks. To the contrary, it shows that throughout the relevant period, Ford suspected the problem was the improper use by certain customers of fuel with high biodiesel concentrations, which seemed plausible in light of the geographic clustering of delamination occurrence and the phenomenon's origin in Brazil. In September 2006, which was one month before Coba purchased his first Ford vehicle, a meeting of Ford managers and engineers concluded that "[t]he cause for damaged fuel tanks is biodiesel (both refined and the home brewed type) with bio concentrations greater than 20% (Ford only authorizes concentrations up to 5%)." App. 1145. And biodiesel fuel remained the prime suspect in February 2007, just before Coba bought his second truck, as apparent in both the message Ford then sent to dealers explaining that fuel containing biodiesel at high concentrations might cause delamination, and its development of the more biodiesel-resistant A35 coating that it released that month. As the District Court concluded, there was no genuine dispute that at the time Coba bought his trucks, Ford "believ[ed] that the problem was due to instances of contaminated fuel, affecting a limited number of tanks, rather than a defectively designed tank." *Coba*, 2017 WL 3332264, at *8.

Although Coba posits that the District Court only reached this conclusion by "construing all facts and drawing

17

all inferences . . . in favor of [Ford],” Appellant’s Br. 56, the evidence to which he points fails to raise a triable issue. Coba relies primarily on a 2005 email from a Ford engineer remarking that recent tests of tanks exhibiting delamination uncovered “no bio-diesel traces” and noting that they were looking at “different additives that could cause [the] delamination.” App. 963. But, viewing this evidence in the light most favorable to Coba, it shows that some Ford engineers had doubts whether biodiesel was the problem and they were continuing to investigate. It does not support the inference, as Coba contends, that Ford knew the problem was a design defect and that biodiesel was a “pretext,” Appellant’s Reply Br. 20. *Cf. United States v. One 1973 Rolls Royce, V.I.N. SRH-16266 By & Through Goodman*, 43 F.3d 794, 809 n.13 (3d Cir. 1994) (distinguishing between knowledge and “suspicion followed by a failure to make further inquiry”). Nor is that inference supported either by the correspondence to which Coba points concerning the mere prevalence of the delamination problem or by other correspondence that post-dates his truck purchases and thus has no bearing on Ford’s earlier knowledge.

Because there is no genuine dispute of material fact as to Ford’s knowledge of a design defect, its failure to disclose that alleged defect does not give rise to liability under the NJCFA.

### b. Materiality of Delamination Risk

Coba fares no better with his alternative theory that Ford violated the NJCFA by failing to disclose material information about the risk of delamination. To establish that information withheld was “material,” Coba would need to show that “a reasonable [person] would attach importance to its existence in determining his [or her] choice of action.” *Suarez v. E. Int’l Coll.*, 50 A.3d 75, 89 (N.J. Super. Ct. App. Div. 2012). But the most favorable evidence in the record for Coba concerning the rate of delamination comes from Ford’s expert who analyzed Ford’s warranty database and found that Ford was replacing Magni-lined steel fuel tanks for model year 2003-2007 F-series trucks like Coba’s at a rate of less than 1% across the United States. That replacement rate, moreover, included all tank replacements, not merely those

related to delamination, suggesting an even lower replacement rate for delaminated tanks. And while Coba criticizes the warranty data as under-inclusive because it covered only tanks that Ford actually replaced while excluding those denied warranty coverage, he identifies no concrete evidence of a higher rate of delamination.[10]

In any event, the relevant question is not the actual rate of delamination viewed in hindsight, but what Ford knew and therefore could have disclosed to customers about that rate. And the warranty data—reflecting delamination-based replacements at a rate of even less than 1%—was the information Ford had at the time. As to that small percentage, based on the undisputed evidence that Ford then believed biodiesel to be the culprit and the recommendation in its owner's manual against using those fuels, Ford had every reason to believe that risk was mitigated—as would any reasonable customer in possession of that same information. We therefore agree with the District Court that "[n]o reasonable factfinder could conclude that this information would be material to a reasonable consumer prospectively deciding, in March 2007, whether to purchase a Ford 6.0L diesel truck." *Coba*, 2017 WL 3332264, at *10. Accordingly, Coba's second NJCFA theory, predicated on non-disclosure of the risk of delamination, also does not survive summary judgment.

---

[10] For example, Coba relies on a document stating that "[i]n April 2008, FCSD management indicated a higher than normal sales volume (500/month) for Diesel Fuel Tanks due to delamination concerns," App. 1348, for the proposition that "Ford admit[ted] that at one point it was replacing over 500 tanks per month due to delamination," Appellant's Br. 61. Inartfully phrased as the document may be, however, on closer inspection, it is apparent that it cannot plausibly bear the weight that Coba places on it. To the contrary, it reflects that—whatever the extent to which delamination concerns may have contributed *in part* to the increased monthly sales volume—in the entire eight years between 2001 and 2008 Ford had identified *in total* only 448 verified delamination concerns.

**III. Conclusion**

For the foregoing reasons, we will affirm the judgment of the District Court.